[Civ. No. 35356. Second Dist., Div. One. June 22, 1970.]

FAYE LEE et al., Plaintiffs and Respondents, v.
SPRINGER LAUNDRIES, INC., Defendant and Appellant.

---

**COUNSEL**

Ellis J. Horvitz and Morton Minikes for Defendant and Appellant.

Abrams & Fox and Martin L. Abrams for Plaintiffs and Respondents.

---

**OPINION**

**LILLIE, J.** — Plaintiffs were given judgment on their "Complaint for Money" alleging non-payment of sums due from defendant, plus interest, under a written contract for the purchase of an industrial linen and supply route; defendant was also ordered to pay plaintiffs the sum of $75 for its wilful failure to file timely answers to certain interrogatories propounded prior to trial, which order does not appear to be challenged. Defendant appeals from the judgment. Appellant asserts the lack of any evidentiary support for the trial court's finding with respect to the principal and interest due, since it was predicated upon an erroneous construction of a key "formula" in the instrument of sale fixing the purchase price.

The contract was drafted by Mr. Federoff, defendant's general manager, and executed on October 18, 1965, after some three weeks of negotiation. Paragraph 2 thereof sets forth the "formula" in the following language: "Burbank [defendant] agrees to pay Interstate [plaintiff] as consideration for this agreement fifty dollars ($50.00) for every one dollar net average weekly volume for the ninty [sic] (90) day period immediately after date of this agreement payable as follows: Five Thousand dollar [sic] $(5,000. 00) [sic] less laundry charges due Burbank by Interstate of $1,910.70 down payment herewith receipt of which is hereby acknowledged with 50% payable at close of Escrow and balance payable ninty [sic] days following close of Escrow."

The trial court found that "the net average weekly volume for the ninety-day period was $386.92, and applying the fifty times said weekly amount

[formula], the court finds the sales price to be the sum of $19,346.00." It further found that defendant was entitled to the $5,000 credit provided for in paragraph 2, leaving a balance due plaintiff in the sum of $14,346 plus 7 percent interest amounting to $2,825.48. According to appellant these findings were erroneously predicated on evidence of the average "gross" volume of weekly sales as distinguished from the "net" volume expressly provided for in the agreement; the two terms being antonyms, the phrase "net average weekly volume" was hence not reasonably susceptible of the construction given it by the trial court. The point is by no means frivolous, as urged by plaintiffs; however, in light of all of the circumstances and the governing law, we are persuaded that appellant's contention cannot be sustained.

■ In California "the intention of the parties as expressed in the contract is the source of contractual rights and duties. A court must ascertain and give effect to this intention by determining what the parties meant by the words they used." (*Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33, 38 [69 Cal.Rptr. 561, 442 P.2d 641].) Contrary to defendant's seeming suggestion, "Words . . . do not have absolute and constant referents. 'A word is a symbol of thought but has no arbitrary and fixed meaning like a symbol of algebra or chemistry, . . .' [Citation.] The meaning of particular words or groups of words varies with the '. . . verbal context and surrounding circumstances and purposes in view of the linguistic education and experience of their users and their hearers or readers (not excluding judges). . . . A word has no meaning apart from these factors; much less does it have an objective meaning, one true meaning'. [Citation.]" (*Ibid,* at p. 38.) ■ Too, in light of the fact that the agreement was prepared by defendant's general manager, the following is apropos: "Words are used in an endless variety of contexts. Their meaning is not subsequently attached to them by the reader but is formulated by the writer and can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words." (*Universal Sales Corp.* v. *California etc. Mfg. Co.,* 20 Cal.2d 751, 776 [128 P.2d 665].)

Certain written interrogatories were put to defendant prior to trial (Code Civ. Proc., § 2030) which were eventually answered on defendant's behalf by Mr. Federoff. The first of such interrogatories was: "State the *net average weekly business* for the 90 day period immediately after October 18, 1965, and in particular, the weekly volume of business from each customer or account, setting forth the name, address and telephone number of the customer or account." (Italics added.) To this interrogatory the following answer was given: "In answer to interrogatory No. 1 propounded by plaintiffs, See Exhibit 'A' attached hereto." Except for a missing heading,

Exhibit "A" (which was received as plaintiffs' number 4 by reference) was conceded to be identical to plaintiffs' number 3 which contained this language by way of heading: "Record of Deliveries by Burbank Taken from Delivery Slips from the Burbank Laundry records on Jan. 21, 1966."

When Federoff was confronted by defendant's counsel with respect to the contents of Exhibit "A," he gave these answers: "Q. I think you pointed out that the business for the particular week was shown at the bottom of the document; isn't that correct, sir? I just don't want any misunderstanding on that phase of your testimony. A. As represented, Yes. Q. All right. That was the answer to the question that you had under oath. A. Yes. Q. Then, just so that we can try to save some time, if one added all the figures at the bottom of the columns, would the amount be $5,030? A. If you added all of the total at the bottom, I would imagine it would be $5,030. Q. Thank you. Sir, did you ever divide into $5,030.04, thirteen? A. No, I did not. Q. Would the division result in the sum of $386.92? A. If we worked it out, I don't know exactly, but I imagine what you have is correct."

Thus it is clear that Federoff, the draftsman of the instrument, originally made no distinction between *net* average weekly business and the *gross* average for such period. At the trial, however, he testified that Exhibits 3 and 4 included customers who ceased to exist—discontinued linen service for one reason or another. It is accordingly argued now by appellant that these lost customers should first be deducted, thus comporting with the definition of "net" by considering the meaning of its antonym "gross" defined in *Pacific Greyhound Lines* v. *Johnson,* 54 Cal.App.2d 297, 302 [129 P.2d 32], as " 'whole, entire, total; without deduction.' " Over objection that it added to or varied the terms of the agreement, such extrinsic evidence was received, the court citing *Diamond* v. *Insurance Co. of North America,* 267 Cal.App.2d 415 [72 Cal.Rptr. 862], which was decided, in turn, on the basis of the holding in the *Pacific Gas & Elec. Co.* case, *supra:* " 'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' " (267 Cal.App.2d at p. 419.) It was further held in *Pacific Gas & Elec. Co.* that "rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties." (*Supra,* 69 Cal.2d at pp. 39-40.) Thus, adhering to the foregoing principle, the proffered evidence was given such preliminary consideration; but that did not require the trial court to adopt the meaning contended for by the witness so testifying. Paren-

thetically, when plaintiffs' counsel (in the course of his objection to the proffered testimony) observed that the agreement should have expressly provided for the exclusion from the formula of all customers "who quit within the 90 days," defendant's trial counsel agreed that "there certainly is going to be an anticipated loss in buying and selling of any business. You are going to have some loss of customers." Continuing, "The purpose which I am trying to get to . . . it was the intention of the parties that the net weekly average sales would be based upon those customers who were retained for the 90-day period, not after the 90 days, but for the 90-day period." Presumably the trial court felt that such saving clause should have been inserted in the instrument by Federoff, its draftsman, failing which, the parties did not intend the meaning contended for by defendant which might well be considered an afterthought. Further support of this determination was testimony by one of the plaintiffs that at no time, prior to its appearance in the present action, did defendant complain that the volume of business was less than that reflected by Exhibits 3 and 4.

■ Finally, defendant relies on *Parsons* v. *Bristol Dev. Co.,* 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839], arguing that the trial court's interpretation of the phrase "net average weekly volume" is wholly unsupported either by reference to the four corners of the instrument itself or from any extrinsic evidence received by the trial court. The circumstances of the case do not sustain such claim. To the contrary, it is held in *Parsons* that even in the absence of extrinsic evidence, the trial court's interpretation of a written instrument must be accepted " 'if such interpretation is reasonable, or if [it] is one of two or more reasonable constructions of the instrument' [citation]." (P. 866.) We cannot say, as a matter of law and after an examination of all the proceedings below, that none of the contingencies just quoted is here applicable.

The judgment is affirmed.

Wood, P. J., and Gustafson, J., concurred.