[Civ. No. 46386. Second Dist., Div. Two. May 14, 1976.]

ADVANCE MEDICAL DIAGNOSTIC LABORATORIES,
Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents;
BIO-SCIENCE LABORATORIES et al.,
Real Parties in Interest and Respondents.

**COUNSEL**

Fierstein, Sturman & Schulman, Fierstein & Sturman, Mark I. Rosenberg and Harvey Fierstein for Plaintiff and Appellant.

John H. Larson, County Counsel, and Raymond G. Fortner, Jr., Deputy County Counsel, for Defendants and Respondents.

Gibson, Dunn & Crutcher, G. Edward Fitzgerald, R. Randall Huff, Adelman & Schwartz and Albert L. Schwartz for Real Parties in Interest and Respondents.

## OPINION

**ROTH, P. J.**—Respondent H. E. Davis (Davis) purchasing agent for respondent County of Los Angeles (County) executed purchase agreements (agreements) with respondents Bio-Science Laboratories (Bio-Science) and Biochemical Procedures (Biochemical), who are real parties in interest (RPIs). Appellant, Advance Medical Diagnostic Laboratories (AMDL), in its capacity as a taxpayer (Code Civ. Proc. § 526a), sought a declaration as a matter of law that the agreements were in direct violation of section 25502.5 of the Government Code and section 270.5 of the Los Angeles County Administrative Code and were thus null and void. In addition AMDL also sought to compel County to seek restitution of all moneys expended under the agreements. This appeal is from the judgment denying the petition for a peremptory writ.

AMDL, Bio-Science, and Biochemical are each corporations engaged in the clinical laboratory testing business. Davis, on behalf of various County medical facilities, sought to obtain lists for numerous and varied anatomical and clinical tests and services. He issued and caused to be circulated "Request for Quotations" (RFQ) among medical testing service businesses, including AMDL and RPIs. The anatomical and clinical laboratory tests and services contemplated under the RFQs were to be supplied as required and requested by the various County medical facilities in suborders issued pursuant to the agreement.

RFQ T-2359, issued December 27, 1971, consisting of 123 pages, solicited price lists for several County medical facilities. A subsequent RFQ, P-553, issued August 14, 1972, solicited price lists for the County-USC Medical Center. Said RFQs contained statements that the yearly monetary value of the RFQs was approximately $1 million in the first installment and $700,000 in the second. The statements were estimates based upon the numbers of tests and services actually purchased under similar agreements in prior years. The statements were intended to and did enable prospective bidders to arrive at a meaningful bid and also provided the purchasing agent with the information necessary to make an objective determination of the lowest potential

costs at which the County could purchase the desired services, needs and requirements from a responsible supplier. County in the RFQs reserved the right to cancel any of the agreements executed as a result of the RFQs if at any time the quality of performance or service did not meet County's standards. The RFQs specifically stated that County did not guarantee any minimum number of tests or monetary value on any agreement resulting from such RFQs.

According to Davis, the purpose of the suborder system was to provide a speedy and efficient means by, which the various County medical facilities could obtain laboratory tests and services. This procedure saved time and administrative costs to County and avoided the burdensome task of having the board of supervisors becoming involved in the bidding and the awarding of any of the agreements or suborders issued thereunder.

County asserts further that the agreements were executed: (a) to encumber the necessary funds in the County Auditor's Office to make sure that there were enough funds available to pay the bills when they were received; and (b) to provide a basis of authority for the County medical facilities to place suborders for such services as specifically needed.

The agreements required County to pay RPIs the contract price for each unit of service when a suborder was issued thereunder and literally thousands of laboratory tests and numerous services at an average cost of approximately $10 were obtained by County over a period of a single year by use of suborders. Although suborders in excess of $10,000 were never issued, the record shows that concurrently with the execution of the agreements, a number of blanket purchase orders were issued to each of the RPIs in excess of $10,000 and obviously the total cost to County was hundreds of thousands of dollars per annum.

The legal issue posed is whether agreements executed and performed as described above violated Government Code section 25502.5[1] which allows County purchasing agents to "engage" into contracts for a County

---

[1]Government Code section 25502.5 provides:

"In counties having a population of 900,000 or more the board of supervisors may direct by ordinance the purchasing agent to engage independent contractors to perform sundry services for the county and the officers thereof, with or without the furnishing of material, where the *estimated aggregate cost* does not exceed ten thousand dollars

as long as the estimated aggregate cost of the contract does not exceed $10,000. AMDL argues that each of the agreements when executed were estimated by County to involve an expenditure far in excess of $10,000; only County's board of supervisors could execute the agreement; Davis therefore had no authority to bind County; and, therefore, the agreements are null and void. (*Miller* v. *McKinnon* (1942) 20 Cal.2d 83 [124 P.2d 34, 140 A.L.R. 570]; *Los Angeles Dredging Co.* v. *Long Beach* (1930) 210 Cal. 348, 353 [291 P. 839, 71 A.L.R. 161].) Respondents argue that the agreements were binding only when County issued suborders; at the time the agreements were executed they did not bind County to issue suborders to purchase specific needs and requirements reasonably capable of an estimated $10,000 or more; the agreements were only standing offers to sell at a fixed price to County; the number of suborders were contingent upon the needs of County's medical facilities; County reserved the right to perform any of the tests or services by its in house facility; County implicitly reserved the right to place a limited number of orders elsewhere and to build its own laboratories.

■ County also argues that it had engaged in the same custom for 30 years. However, this custom of County even if conducted in the best of faith will not make legal what is illegal. (*County of Modoc* v. *Spencer* (1894) 103 Cal. 498 [37 P. 483].)

■ The trial court accepted respondents' arguments.

Settled principles of law, however, require this court to determine the nature of the agreements and what the respective parties intended their obligations to each other to be. (Civ. Code, §§ 1636, 1647; *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Moss Dev. Co.* v. *Geary* (1974) 41 Cal.App.3d 1 [115 Cal.Rptr. 736]; *Lee* v. *Springer Laundries, Inc.* (1970) 8 Cal.App.3d 1003 [87 Cal.Rptr. 746].) We are further mindful of the principle that a contract should be construed in such a manner as will render it lawful, reasonable and operative if it can be

($10,000), and upon such direction the purchasing agent shall so engage independent contractors.

"The board of supervisors may establish rules and regulations to effectuate the purpose of this section." (Italics added.)

Pursuant to the statute, the Los Angeles County Board of Supervisors enacted Los Angeles County Administrative Code, section 270.5, directing the County purchasing agent to engage independent contractors in situations permitted by the statute.

done without violating the intention of the parties. (Civ. Code, § 1643; *Entremont* v. *Whitsell* (1939) 13 Cal.2d 290 [89 P.2d 392].)

■ It is clearly the law that the accepted bids of RPIs to meet all the needs and requirements of County on the items specified by County, even though County orders only what it may need and require at the prices fixed in the RFQs, for a definite period result in firm contracts. (*Fisher* v. *Parsons* (1963) 213 Cal.App.2d 829 [29 Cal.Rptr. 210]; *Anderson* v. *La Rinconada Country Club* (1935) 4 Cal.App.2d 197 [40 P.2d 571]; *Ross* v. *Frank W. Dunne, Co.* (1953) 119 Cal.App.2d 690 [260 P.2d 104]; 1 Witkin, Summary of Cal. Law (8th ed.) Contracts, p. 162 et seq.; 1A Corbin on Contracts § 156 (1963).) It is conceded by the parties and the trial court specifically found that County "parted with the right to buy goods and services elsewhere."

The RFQs discussed above are meticulous documents in excess of 100 pages. They list approximately 401 tests to be performed, have an exhaustive procedure, and in detail spell out various covenants and conditions. It is obvious that completing an RFQ in acceptable form is a task that requires hours of time of a knowledgeable prime executive.

In addition, all of the questions, conditions, and covenants set forth in the RFQs emphasize the significance of the successful bidder's financial responsibility, its staff of professional and trained personnel and physical facilities of a diverse nature to enable it to perform for the full term of the agreement. Among the requirements are: (1) public liability insurance in the amount of $1 million; (2) professional liability insurance in the amount of $500,000; (3) Workmen's compensation insurance; (4) a surety bond; (5) continuous maintenance of the requirements conditioned for a license by the State Department of Public Health; (6) at least one of the laboratory directors as a licensed M.D., (7) a sufficient number of full-time Ph.D.s commensurate with the type and quantity of work being done in the standard demanded; (8) availability of adequate facilities and personnel for 24 hours a day, 7 days a week to provide normal and emergency service; (9) permission for continuous quality control; and (10) numerous other covenants and conditions among which and the least of which are County's right of inspection, questioning of prices, remedies for offsets and damages and requirements of the laboratories to install and maintain certain equipment at their own expense in County facilities.

The RFQs completed by RPIs when accepted by County became, by means of separate written documents, agreements. These agreements contain all of the conditions and covenants set forth in the RFQs, only some of which we have listed.

In each RFQ it was estimated that over 250,000 tests would be required. The statements would not have been made if County did not expect the RPIs to rely upon them, and the RPIs would not have executed the agreements if they had not relied upon the representations.

Under the provisions of RFQs, County could perform any test in its in-house laboratory. County also had the right to place a limited number of orders with companies other than RPIs and upon the building of its own master laboratory facility County could refuse to order any tests or services. Accordingly respondents argue that the agreements, even though binding, did not commit County to purchase any identifiable or specific service having a reasonable estimated cost in excess of $10,000. Although the RFQs contained these provisions they are meaningless since County did not have the capabilities to perform the number of tests that were required.

There is nothing to remotely suggest that County would or could cancel the agreements if it built its own laboratory. The cost of constructing a master laboratory facility, equipping it, manning it with highly skilled professionals and specially trained and educated artisans, would require the expenditure of millions of unappropriated dollars. In addition, the time period to implement such a plan would take as long as the term of each agreement.

The reservation in the agreements permitting County to place a limited number of test orders elsewhere is in the County's own language just that. Logically it may be inferred that the reservation was required to allow County to purchase nonenumerated tests, or for the purpose of enabling County to check on the prices, quality of work, and speed of the enumerated tests. If the agreements were valid and County indulged in the continued practice of placing large orders for enumerated tests with other laboratories, such conduct would undoubtedly constitute an actionable breach.

It is clear that even though each test or service is a separate item listed and merged with numerous others on various suborders, nonetheless,

there is no question that County committed to agreements requiring an estimated expenditure greatly in excess of $10,000.

This court need not speculate on what contingencies could have arisen which would have nullified or cancelled the agreements. We focus instead on the undisputed facts which demonstrate that the expenditure to which County was *committed* by the purchase agreements amounted to millions of dollars and that County's commitment was, in fact, at the time it was made, estimated in the millions.

■ Section 25502.5 speaks only of limiting the authority of the purchasing agent "to engage . . . services for the County . . . where the *estimated aggregate cost* does not exceed ten thousand dollars ($10,000)." This section would be rendered meaningless if it were not for section 25502.6 which specifically prohibits a purchasing agent " . . to split or separate into smaller work orders . . . for the purpose of evading the provisions of this chapter . . . ." The fact that the two sections were passed at the same time, as part of the same bill, clearly indicates that the Legislature intended that the estimated cost of the *total* project be the measure of a contract's validity rather than the estimated cost of the individual "smaller work orders."

■ In our opinion the prime negotiating documents, the RFQs, and the following agreements clearly indicate that the parties confidently expected County's needs and requirements for the two-year period to reach the estimated costs of $1.4 million for the Bio-Science agreement and $2 million for the Biochemical agreement. Accordingly the agreements should have been considered and executed by the board of supervisors, Davis exceeded his statutory authority in executing the agreements and they are null and void if the trial court finds that they were never ratified, either expressly or impliedly, by the board of supervisors.

■ AMDL argues that if the agreements are null and void it follows that County's board of supervisors must "be ordered to institute appropriate legal proceedings to seek restitution of all public funds received by RPIs under the agreements." We disagree.

■ The general rule is that where contracts, having been executed in violation of the law limiting authority for their execution, are null and void, estoppel to deny their validity cannot be asserted and normally quasi-contract recovery is not allowed. (See, e.g., *Zottman* v. *San Francisco* (1862) 20 Cal. 96; *Reams* v. *Cooley* (1915) 171 Cal. 150 [152 P.

293]; *Los Angeles Dredging Co.* v. *Long Beach* (1930) 210 Cal. 348 [291 P. 839, 71 A.L.R. 161].) And *Miller* v. *McKinnon* (1942) 20 Cal.2d 83 [124 P.2d 34, 140 A.L.R. 570] holds that money paid under a void contract may be recovered in a suit filed by a taxpayer on behalf of the governmental agency involved.

However in *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423], the court indicated that the rule is not absolute and that a distinction should "be recognized between those cases where the public entity to be estopped has the legal power to accomplish directly what the estoppel will accomplish indirectly, and, on the other hand those cases where the public entity does not have such power." (3 Cal.3d at p. 497.) The court then indicated that in the former cases estoppel is applicable. ■ There is no doubt that the board of supervisors of County had the right to execute the agreements[2] and in our opinion the doctrine of equitable estoppel as enunciated in *Mansell* may apply when all the facts are considered.

■ In *Mansell* the court stated: "The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present, and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (3 Cal.3d at pp. 496-497.) The *Mansell* court cited with approval *City of Imperial Beach* v. *Algert* (1962) 200 Cal.App.2d 48 [19 Cal.Rptr. 144]. In *Algert* estoppel was allowed against a governmental entity and the *Mansell* court contrasted *Algert* with *County of San Diego* v. *Cal. Water etc. Co.* (1947) 30 Cal.2d 817 [186 P.2d 124, 175 A.L.R. 747], in which estoppel was not allowed. Approving the *Algert* rationale the *Mansell* court stated: "In assessing the quantum of injustice the court properly took into account the continuing course of conduct by which the governmental agency had induced reliance. The nature of that course of conduct also was of extreme relevance in assessing the effect upon public policy which would

---

[2]In *Mansell,* as at bench, the governmental entity did have the general power to do directly what estoppel would do indirectly. The *Mansell* court then stated: "Because the state does have such power, albeit only in narrowly limited circumstances, it is unnecessary for us to decide whether the standard which we have stated to govern the application of estoppel against governmental entities holds true in a case where the governmental entity in question *utterly* lacks the power to effect that which an estoppel against it would accomplish." (Italics added.) 3 Cal.3d at p. 499.

result from the raising of an estoppel. While in *County of San Diego* the raising of an estoppel would have permitted county officials to avoid statutory abandonment requirements by little more than a 'bare promise to abandon,' in *Algert* the precedent set by allowing estoppel was much narrower in that it depended upon a considerable combination of governmental actions not likely to recur." (3 Cal.3d at p. 498.)

▪ The test for recognizing the plea of equitable estoppel, assuming the power of the public entity "to accomplish directly what estoppel will accomplish indirectly," is whether as applied to the facts of a particular case the public policy enunciated in the statute violated outweighs the injustice created by its literal enforcement.[3]

▪ The agreements before the court although void have expired and have been completely performed in all respects by the parties. Nothing in the record suggests corruption, favoritism, unreasonable pricing or lack of complete and quality performance in connection with the agreements. It is also clear that the County board of supervisors did have the general power to execute the agreements and did in fact appropriate funds with which to pay and permitted fulfillment of the agreements. Furthermore, the patent injustice and hardship that would result to RPIs if they were forced to return $3.4 million is undeniable. There is no suggestion that County or Davis will not abide by and accept the judgment of this court. The execution by County purchasing agent of similar agreements is not likely to recur unless the current statutes are enlarged. There does not appear to be any frustration of public policy that would result if County were estopped from denying the agreements. Under the balancing test as set forth in *Mansell,* a chancellor in equity could find that County would be estopped to proceed. ▪ The relief sought by appellant by way of mandate sounds in equity and is addressed to the conscience of the trial judge sitting as a chancellor in equity. (*Dowell* v. *Superior Court* (1956) 47 Cal.2d 483 [304 P.2d 1009].) ▪ We feel it should be returned to the trial court for its consideration of this issue.

The judgment is reversed and the trial court is ordered to find and conclude that the agreements discussed are in violation of section

[3]For other cases that have applied the same test but where estoppel has been denied see: *People* v. *Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185 [119 Cal.Rptr. 266]; *Pettitt* v. *City of Fresno* (1973) 34 Cal.App.3d 813 [110 Cal.Rptr. 262]; *State of California* v. *Haslett Co.* (1975) 45 Cal.App.3d 252 [119 Cal.Rptr. 78].

25502.5 of the Government Code, and to vacate and delete any findings and conclusions of law in conflict therewith. Thereafter on the record, or with the aid of additional relevant evidence if desired by the court or the parties, the court is directed to make findings of fact and conclusions of law on the ratification and estoppel issues, and to render its judgment in accordance therewith. Nothing herein will prevent the Board of Supervisors of the County of Los Angeles from expressly ratifying these contracts in the manner in which the authority to award them could have originally been exercised.

Fleming, J., and Beach, J., concurred.

Petitions for a rehearing were denied June 9, 1976, and the opinion and judgment were modified to read as printed above. The petition of the defendants and respondents for a hearing by the Supreme Court was denied July 8, 1976.