[No. B004934. Second Dist., Div. Seven. Dec. 10, 1985.]

J. ROBERT MEADOWS et al., Plaintiffs and Appellants, v.
RICHARD LEE et al., Defendants and Respondents.

COUNSEL

Worthington & Worthington, Jacquelynn C. Pope and William F. Worthington, Jr., for Plaintiffs and Appellants.

Stearns, Gross, Moore & Rusch, Harward A. Stearns and Richard T. Gross for Defendants, and Respondents.

OPINION

SCHWAB (H. J.), J.*—This is an appeal from a judgment denying declaratory relief as to specific performance relative to a "so-called" backup agreement. On November 19, 1977, respondents J. Robert Grimsgaard and Lillie A. Grimsgaard (hereinafter referred to as Grimsgaards) accepted a counteroffer of respondent Dr. Richard Lee (hereinafter referred to as Lee) for the purchase of real property at 2503 El Venado Drive, Hacienda Heights, California (hereinafter referred to as the El Venado property). In this contract between Lee and the Grimsgaards, Lee was to transfer the El Venado property to the Grimsgaards free from any claims, liens or encumbrances. The Grimsgaards were to purchase the El Venado property for $200,000. They were to pay $80,000 cash to Lee and were to deliver a promissory note for $120,000 to him with interest thereon, secured by a first deed of trust against the El Venado property.

It was further agreed that the Grimsgaards would have until January 21, 1978, to sell the certain real property then owned by them, known as the

---

*Assigned by the Chairperson of the Judicial Council.

Garden Terrace property. Escrow in connection with the El Venado property was to close within 60 days thereafter. The escrow was to be handled by Comet Escrow, Inc.

The problem arises that on November 22, 1977, appellants J. Robert Meadows and Elizabeth L. Meadows (hereinafter referred to as Meadows), entered into a written contract with Lee for the purchase of the El Venado property for the same sum of money, $200,000. The contract between the Meadows and Lee contained the following pertinent language: "This is a back-up offer to any prior offers which may have been accepted."

By stipulation of the parties, it was further agreed, relative to the "back-up" offer:

"The Meadows' 'back-up' offer is a contract just as the prior accepted offer of the Grimsgaards' is a contract.

"The Meadows' contract contains a condition precedent. That condition precedent is the failure, termination, cancellation, or novation of the Grimsgaards' contract. If the condition occurs, the Meadows contract becomes the primary contract."

In January of 1978, Mrs. Grimsgaard was advised that there was another party who had contracted to purchase the El Venado property, which was a "back-up" agreement in the event that the purchase of the El Venado property by the Grimsgaards was not consummated.

On January 11, 1978, Lee and the Grimsgaards removed the contingency which required the sale of the Garden Terrace house as a condition relative to the escrow instructions.

On January 12, 1978, a Dr. Giordano and a Sandra Bunde (also spelled as Giadino and Bundy in the transcripts) filed a notice of pendency of an action or "lis pendens" wherein they claimed an interest in the El Venado property pursuant to an alleged lease and option which they had allegedly exercised. By March 21, 1978, the date for the escrow to close as to the sale of the El Venado property from Lee to the Grimsgaards, the lis pendens

had not been removed and the Grimsgaards had not placed money in the escrow. In fact the lis pendens was not dismissed until October 6, 1978.

On April 10, 1978, Lee and the Grimsgaards entered into a "hold harmless" agreement whereby they agreed to hold each other harmless "in all matters relating to the purchase and sale" of the El Venado property and further "held harmless" one John E. Dorius, realtor, from liability in connection with the contract between Lee and the Grimsgaards. This document further provided for allocation of profits or losses between Lee and the Grimsgaards if the lis pendens had not been removed before April 1, 1984.

On April 20, 1978, Lee and the Grimsgaards executed a document whereby Lee continued to remain obligated to convey the El Venado property to the Grimsgaards and the Grimsgaards were to convey their Garden Terrace property to Lee and to deliver to Lee an all-inclusive note and deed of trust.

In a letter dated April 28, 1978, the Grimsgaards wrote to Comet Escrow, which had been holding escrow between the Grimsgaards and Lee, directing the escrow holder to hold it open until Lee could deliver clear title or until the escrow holder was otherwise instructed by the Grimsgaards. On May 1, 1978, Lee gave the Grimsgaards notice to perform the original purchase agreement per the escrow instructions dated November 21 or cancel the escrow. On May 5, 1978, the attorneys for Lee wrote to Comet Escrow stating that he "hereby cancels" said escrow since the Grimsgaards had failed to perform within the allotted time.

*However,* on May 22, 1978, by means of an amendment to the escrow instructions with Comet Escrow, Inc., as authorized by both Lee and the Grimsgaards, Comet was instructed to cancel the subject escrow and ordered to disburse the funds on deposit in the escrow in the amount of $2,000 to Vera's Escrow Company.

On May 24, 1978, the escrow at Vera's Escrow closed, Lee received title to the Garden Terrace property and the Grimsgaards received title to the El Venado property, delivering to Lee the all inclusive note and deed of trust.

On September 13, 1978, the Meadows filed a complaint in the instant action requesting the specific performance of the backup agreement and declaratory relief as against the Grimsgaards. In the court trial, where there was extensive testimony, Mrs. Grimsgaard testified that relative to the ex-

change agreement, she never at any time ever intended to "cancel out the original deal."

James Dorius, a real estate agent involved in certain of the negotiations, testified that he believed that the transactions were ongoing.

Judgment was entered in favor of respondents Lee and the Grimsgaards.

The Meadows allege that their backup agreement should have been enforced because they contend that (1) the contract between the Grimsgaards and Lee expired when the escrow had not closed by March 21, 1978, and (2) that the execution of the hold harmless agreement of April 10, 1978, and the real estate purchase agreement of April 20, 1978, constituted novations as a matter of law.[1]

On the other hand, respondents Grimsgaards and Lee aver that there was only one contract between themselves which was merely modified from time to time until the final consummation of the real estate transaction.

■ As the matter was submitted before the trial court on the basis of stipulations, documentary evidence and live testimony which involved serious questions of credibility, this court should not independently interpret the instruments but instead is bound by the substantial evidence rule in evaluating the trial court's interpretation. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]. *Davies Machinery Co.* v. *Pine Mountain Club, Inc., supra,* 39 Cal.App.3d at p. 23; *Service Employees Internat. Union, Local 18* v. *American Building Maintenance Co.* (1972) 29 Cal.App.3d 356, 359 [105 Cal.Rptr. 564].)

■ In resolving the issues of the sufficiency of the evidence, an appellate court is bound by the established rules of review and all factual matters will be viewed most favorably to the prevailing party and in support of the judgment. ■ Issues of credibility are likewise in the province of the trier of fact. As such, an appellate court will ordinarily look only at the evidence supporting the prevailing party and disregard any contrary showing. ■ All conflicts, therefore, are to be resolved in favor of the respondent. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480]; *Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689]; *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

---

[1] "A novation is a substitution by agreement of a new obligation for an existing one with the intent to extinguish the latter." (Civ. Code, §§ 1530-1532; *Davies Machinery Co.* v. *Pine Mountain Club, Inc.* (1974) 39 Cal.App.3d 18, 24 [113 Cal.Rptr. 784].)

 The issue presented to the trial court was primarily one of intent; namely, did the Grimsgaards and Lee really intend to cause to fail, terminate, cancel and/or novate the original contract, or was their intention merely to modify the original agreement? (*Hunt* v. *Smyth* (1972) 25 Cal.App.3d 807, 817-818 [101 Cal.Rptr. 4]; *Klepper* v. *Hoover* (1971) 21 Cal.App.3d 460, 463 [98 Cal.Rptr. 482]; *Eluschuk* v. *Chemical Engineers Termite Control, Inc.* (1966) 246 Cal.App.2d 463, 469 [54 Cal.Rptr. 711]; *San Gabriel Val. Ready-Mixt* v. *Casillas* (1956) 142 Cal.App.2d 137, 140-141 [298 P.2d 76].)

What makes this case so unusual is that the original parties, the seller Lee and the buyers Grimsgaards, are not contesting the transaction. Both the buyers and the seller, according to the record, seem quite happy with the sale. Therefore the usual scenario of the seller and buyer each disputing their respective intents is not involved herein. Instead, a third party is attempting to assert its "back-up" agreement by challenging the state of mind of the seller and buyers, alleging that they intended to cause to fail, terminate, cancel and/or novate, instead of merely modifying the original contract. Thus the burden of the Meadows attempting to set aside the contractual relationship between the Grimsgaards and Lee, to which they seem to be satisfied, is indeed a heavy one.

The trial court was greatly impressed by the above set of facts, namely that it was dealing with the original parties relative to the sale of the El Venado property. There is substantial evidence under the unique factual posture of this case to uphold the judgment by reason alone that the sale was consummated between the original contracting parties in the absence of any showing of fraud or collusion as against third parties. Under factual circumstances, such as herein, where (1) neither fraud nor collusion is shown, (2) the original contracting parties contend that their states of mind were such as to uphold the contract between them, (3) a third party attempts to challenge that contract by alleging a state of mind as to the original contracting parties that would defeat said contract, and (4) the issue of intent is ambiguous and subject to interpretation, a trial court may properly rule in favor of the original contracting parties on the ground that they were, in fact, the original contracting parties.

Several policies support this construction. The interpretation of a contract is often shown by the acts and conduct of the parties subsequent to the execution of the contract and prior to its controversy. (*Lix* v. *Edwards* (1978) 82 Cal.App.3d 573, 579 [147 Cal.Rptr. 294]; *Spott Electrical Co.* v. *Industrial Indem. Co.* (1973) 30 Cal.App.3d 797, 808 [106 Cal.Rptr. 710]; *Automobile Salesmen's Union* v. *Eastbay Motor Car Dealers, Inc.* (1970) 10 Cal.App.3d 419, 424 [89 Cal.Rptr. 20].) If two parties

enter into a contract and appear to be satisfied with that agreement, their subsequent happiness with that arrangement, in the absence of fraud or collusion or clear express repudiation, should be a powerful incentive to sustain the continued viability of that contract. In the same regard, contracts should be interpreted whenever possible as being operative. (Civ. Code, § 1643; *Advance Medical Diagnostic Laboratories* v. *County of Los Angeles* (1976) 58 Cal.App.3d 263, 269-270 [129 Cal.Rptr. 723].) ■ Furthermore, there is a policy against interfering with contracts by third parties. (See *Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 39-40 [172 P.2d 867].)

■ ■ There was neither allegation nor evidence of fraud or collusion on the part of Lee and the Grimsgaards relative to the Meadows. The intent of Lee and the Grimsgaards, relative to the contractual relationship between each other, was the sole issue to be decided. Substantial evidence therefore exists under the unique factual scenario to award judgment in favor of the original contracting parties because they were, in fact, the original contracting parties.[2]

The Meadows allege that the trial court erred in various evidentiary rules and was so oppressive in its handling of the matter that it was guilty of judicial misconduct. To the contrary, the record reflects that the trial court presided in a most fair and equitable manner, attempting to sift through the facts, since it was the trier of fact without a jury. (*People* v. *Carlucci* (1979) 23 Cal.3d 249, 256 [152 Cal.Rptr. 439, 590 P.2d 15]; *Kurtz* v. *Kurtz* (1961) 189 Cal.App.2d 320, 327 [11 Cal.Rptr. 230]; *Gary* v. *Avery* (1960) 178 Cal.App.2d 574, 579 [3 Cal.Rptr. 20]; *Martin* v. *Martin* (1947) 79 Cal.App.2d 409, 410-411 [179 P.2d 655].)

■ It is asserted that the trial court made over liberal use of the "best evidence rule" in sustaining objections. However, the record reflects that in the majority of instances, said grounds were well warranted since the

---

[2]We are not saying as a matter of law that persons making a "back-up" offer, in the absence of fraud or collusion, are always precluded from attacking the viability of the contract between the original contracting parties. What we are holding is that whenever a third party attempts to assert its backup offer against the original contracting parties he or she has an extremely heavy burden and that under the facts of this particular case there was substantial evidence to sustain the judgment by reason of respondents' status as the original contracting parties.

The importance of the "back-up" offer in this particular case was that if the transaction between the Grimsgaards and Lee had fallen through, the Meadows would have had a right to purchase the El Venado property over any other third parties desiring to obtain said property. With all due respect to the scholarly dissent, a backup contract does have a practical viable effect under our ruling. Persons will still engage in "back-up" agreements, knowing that their contractual rights to obtain properties over other third parties will be upheld if the transaction between the original contracting parties should truly fail.

answers sought by counsel were within the bodies of the writings themselves and therefore did not bear being repeated by the live witnesses. (Evid. Code, § 1500; *Sublett* v. *Henry's etc. Lunch* (1942) 21 Cal.2d 273, 275 [131 P.2d 369].) In light of the previous discussion relative to the sufficiency of the evidence in sustaining the judgment, any evidentiary errors complained of on appeal, and discussed in the dissent, pale into insignificance.

 The Meadows contend that the trial court erred in repeatedly urging that the issues involved were those of law and not of fact, and that intent was therefore not relevant. The record reflects that when the trial court heard final arguments by counsel in terms of making his ruling, he very definitely believed the issues to be both factual and legal, and that the question of intent was one of prime concern.

 It is further urged that the trial court improperly precluded Mrs. Grimsgaard from being asked whether she had arranged with Dr. Giordano to have him file the lis pendens. The Meadows never attempted to bolster this contention by calling any other witnesses to testify regarding this rather flimsy allegation.

The trial court's rulings were proper on the grounds of relevancy. (Evid. Code, § 210; *Brokopp* v. *Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853 [139 Cal.Rptr. 888, 93 A.L.R.3d 537].) Mrs. Grimsgaard had already testified that she had never heard the names of the persons who filed the lis pendens before January 1, 1978, and that she had not had any personal contact with them before January 12, 1978, the date the lis pendens was filed. Even if she had encouraged the filing of the lis pendens, such would be relevant only as to her desire to keep the original contract alive, so to prevent default for not performing, and not as to any issue involved with the Meadows.

As to the other evidentiary issues raised on appeal, they were for the most part correctly ruled upon. Those rulings which were questionable would in no way have been prejudicial to the Meadows. (*Smith* v. *Lewis* (1975) 13 Cal.3d 349, 365 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231], overruled on another ground in *In re Marriage of Brown* (1976) 15 Cal.3d 838, 851, fn. 14 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164]; *Kalfus* v. *Fraze* (1955) 136 Cal.App.2d 415, 434 [288 P.2d 967].)

The Meadows finally argue that the trial court erred in awarding attorneys' fees. At the end of the proceeding after judgment had been entered, the trial court granted respondents Grimsgaards and Lee leave to amend the pleadings to ask for attorneys' fees. In the backup agreement between Lee

and the Meadows it was stated in pertinent part: "In the event that either party shall be required to institute legal action to enforce the terms of this Agreement or rights arising out of this Agreement, the prevailing party shall be entitled to receive from the other party reasonable attorney's costs and fees in an amount to be determined by the court having jurisdiction of such action."

The trial court ruled that it would "allow the costs as requested in the memo of costs and disbursements, except that I believe the attorney fees should be a separate item in the judgment." As such, attorneys' fees were properly awardable under the bilateral provision aforecited as special damages or costs. (Civ. Code, § 1717; *Christensen* v. *Dewor Developments* (1983) 33 Cal.3d 778, 786-787 [191 Cal.Rptr. 8, 661 P.2d 1088]; *Sain* v. *Silvestre* (1978) 78 Cal.App.3d 461, 475-476 [144 Cal.Rptr. 478]; *Beneficial Standard Properties, Inc.* v. *Scharps* (1977) 67 Cal.App.3d 227, 231-232 [136 Cal.Rptr. 549]; *T.E.D. Bearing Co.* v. *Walter E. Heller & Co.* (1974) 38 Cal.App.3d 59, 63-64 [112 Cal.Rptr. 910].)

Respondents shall recover costs on appeal to be determined in the superior court. The judgment is affirmed.

Thompson, Acting P. J., concurred.

**JOHNSON, J.**—I respectfully dissent.

The majority correctly points out the controlling factor in a novation contest is the intent of the parties. The question here was whether the parties to the original agreement, the seller Lee and the buyers Grimsgaards, intended to cancel that agreement and substitute a new agreement.

" 'Novation is the substitution of a new obligation for an existing one.' (Civ. Code, § 1530.) 'Novation is made: 1. By the substitution of a new obligation between the same parties, with intent to extinguish the old obligation. . . .' (§ 1531.)"[1] (*Hunt* v. *Smyth* (1972) 25 Cal.App.3d 807, 818 [101 Cal.Rptr. 4].) The facts surrounding the case admittedly are rather unusual in a novation contest. Neither of the original parties is contesting the transaction or claiming novation. The trial court was greatly impressed with this atypical scenario. It determined the status of the parties alone provided sufficient evidence to conclusively find the parties did not intend

---

[1] Section 1531 of the California Civil Code sets forth the manner in which a novation may be made. "Novation is made: [¶] 1. By the substitution of a new obligation between the same parties, with intent to extinguish the old obligation; [¶] 2. By the substitution of a new debtor in place of the old one, with intent to release the latter; or [¶] 3. By the substitution of a new creditor in place of the old one, with intent to transfer the rights of the latter to the former."

a novation. Thus, he excluded other evidence which *may* have shown the parties had a contrary intent.

The trial judge held the parties intended a single continuous transaction, evidenced by the fact they went from point A to point B. "THE COURT: They [the Grimsgaards] offered to acquire the Lee property and what happened eventually? They acquired that property." It is well established that intent can be inferred from the facts and circumstances surrounding the transactions in question. (*Manfre* v. *Sharp,* (1930) 210 Cal. 479, 480 [292 P. 465].) However, due to the nature of novation which hinges so much on the parties' subjective intent at the time they executed the second contract, I am unwilling to hold this intent can be inferred solely from the fact the original parties are not presently disputing the validity of the second contract. Accordingly, I would reverse to allow the admission of other evidence which might bear on the crucial issue of intent.

## I. STATUS AS AN ORIGINAL PARTY DOES NOT PRECLUDE A NOVATION OF THE ORIGINAL AGREEMENT

Civil Code section 1531 expressly contemplates the two original parties can create a novation. If there were a valid novation of the Grimsgaards' contract, by substituting a new agreement for the old agreement rather than a substitution of parties, obviously Lee and the Grimsgaards would retain their status as "original" parties. Accordingly, the fact they remain the original parties is not a factor which automatically excludes the possibility of novation.

Furthermore, if one accepts the position that the status of the parties is controlling on the issue of intent, a third party with a backup contract, conditioned upon novation of the original contract, would never be able to challenge the original contract on the basis of novation. This obviously was not the intent of the seller Lee and appellants Meadows in executing the backup contract. The backup contract between Meadows and Lee was conditioned upon the "failure, termination, cancellation *or novation* of the Grimsgaards' contract." (Italics added.) If any of these conditions occurred, the Meadows contract was to become the primary contract. The event of novation would not have been included, as a condition precedent to effectiveness of the backup contract, were it not deemed to be a possible scenario between the original parties.

## II. THE COURT ERRONEOUSLY EXCLUDED OTHER EVIDENCE ON THE ISSUE OF WHETHER THE ORIGINAL PARTIES INTENDED A NOVATION

Counsel for appellants sought to prove the intent required for a novation by questioning the parties and witnesses on cross-examination. The trial

judge sustained objections to introduction of evidence on the issue of intent, and proceeded to question the parties himself. On appeal, the issue raised is whether the trial court erroneously prevented appellants from introducing evidence which may have supported their claim of novation. I would hold the trial court wrongfully excluded the evidence submitted by appellants. In doing so, the court precluded appellants from fully presenting their case.

The trial court based its exclusion of the evidence on several faulty premises: 1) the intent of the parties was irrelevant; 2) since the documents were unambiguous, intent of the parties was irrelevant; and 3) the issue of novation could be determined solely from the documents. Due to a misinterpretation of the applicable principles relating to novation, the trial court failed to correctly apply the appropriate balancing tests which are essential to a determination of whether to exclude evidence.

### A. *Parol Evidence Is Admissible to Show Novation*

It is fundamental to our court system that "[a] party is entitled to have received in evidence and considered by the court, before findings are made, all competent, relevant and material evidence on any material issue." (*Estate of Horman* (1968) 265 Cal.App.2d 796, 808 [71 Cal.Rptr. 780].) However, in a contract action, parol evidence is generally inadmissible where the terms of the agreement are in writing. (Code Civ. Proc., § 1856.) Nonetheless, the rule of exclusion does not apply where extrinsic evidence is offered to interpret, or explain the meaning of a written contract, or to show discharge by any permissible means of extinguishing a contractual obligation. (*Griswold* v. *Frame* (1920) 48 Cal.App. 178, 182 [191 P. 962].) In the case at bench we are primarily concerned with the parol evidence rule as it relates to admissibility of evidence to show a novation.

As previously noted, the controlling factor in a novation contest is the intent of the parties at the time the agreement in question was executed. (*Alexander* v. *Angel* (1951) 37 Cal.2d 856, 860 [236 P.2d 561].) The trial court held that due to the unambiguous nature of the writings, the intent of the parties was irrelevant. However, parol evidence is admissible to show intent when there is a dispute as to the meaning of the terms used in the contract, even if the terms appear clear and unambiguous to the court. (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37, 39 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].) In this case the dispute goes directly to the issue of the intent of the parties in executing the second contract. By the terms of section 1531 itself the intent with which the second contract is made becomes the critical element in determining whether a novation has occurred. We know a new obligation was substituted between the original parties. The question is whether this

document was executed "with intent to extinguish the old obligation." (Civ. Code, § 1531, subd. 1.) "[Where] . . . there [is] a dispute with reference to the intent of the parties . . . parol evidence is always admissible." (*Ehrenreich* v. *Shelton* (1963) 213 Cal.App.2d 376, 381 [28 Cal.Rptr. 855].)

Appellants' counsel sought to elicit testimony from the parties and witnesses which he claimed would prove Lee and the Grimsgaards intended to substitute the new agreement for the old agreement, thereby effectuating a novation. The trial court sustained objections to this testimony stating the documents themselves were dispositive on the issue. The trial court's exclusion of the evidence is not consistent with established rules of admitting parol evidence in a novation contest.

A novation has been found to exist where all terms of a subsequent agreement changed with respect to the same subject property. (*Simmons* v. *Sweeney* (1910) 13 Cal.App. 283 [109 P. 265].) In that case the terms of the two agreements were entirely inconsistent and could not be operative at the same time. Furthermore, the evidence presented showed the parties acted in pursuance of the second agreement. (13 Cal.App. at p. 288.) In this case, the facts are similar in that the two agreements between Lee and the Grimsgaards were entirely inconsistent as to terms and conditions with respect to the same subject property, the two agreements could not be operative at the same time, and the parties acted in pursuance of the second agreement. Thus, it was reasonable for the Meadows to assume a novation had occurred. If there was any possibility a novation had occurred, the Meadows' had a valid cause of action to enforce their backup contract. In *Reynolds* v. *Mead* (1944) 62 Cal.App.2d 179, 180 [144 P.2d 424], the court held "[i]f the [second] note [was] . . . taken as a substitute for the note in dispute, with the intent of extinguishing the obligation of it . . . the transaction constituted a defense by way of novation under Sections 1530, 1531, 1532 of the Civil Code; and the defendants were entitled to have presented [their evidence] . . . ." Likewise, in the instant case the Meadows should have been allowed to present the evidence which would show an intent to novate.

I would further rely on an independent and sufficient ground for allowing parol evidence concerning the two contracts between the original parties. This is a dispute between one set of parties and appellants who are strangers to the contract. As Jefferson summarizes California law: "It long has been the law that when a written contract is involved, the parol evidence rule applies only between the parties to the contract and their successors in interest. It follows, therefore, that in an action between a party to a written agreement . . . and a nonparty, extrinsic evidence may be introduced to contradict or vary the written agreement." (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) Parol Evidence Rule, § 32.8, p. 1168; see *Nichols*

v. *Arthur Murray, Inc.* (1967) 248 Cal.App.2d 610 [56 Cal.Rptr. 728]; *Gordon* v. *D & G Escrow Corp.* (1975) 48 Cal.App.3d 616 [122 Cal.Rptr. 150].) Appellants are not parties to the contract they seek to prove was extinguished by novation. Nor are they parties to the second contract they contend accomplished a novation of the first. And merely because a novation of the contract between two other parties would activate their independent backup contract does not make them "successors" of either of the original parties. Consequently, they are nonparties as far as the first and second contracts in this action are concerned. As such, they are entitled to introduce parol evidence about them even if this evidence would, in some sense, contradict or vary the express terms of these contracts. (*Gordon* v. *D & G Escrow Corp., supra,* 48 Cal.App.3d 616, 626.)

B. *Oral Evidence as to the Original Parties' Intent Was Not Properly Excluded Under the Best Evidence Rule*

The trial judge claimed the written documents were the "best evidence" of the intent of the parties, and sustained objections to appellant's questions on that basis. Even respondents concede this was a misapplication of the best evidence rule. The best evidence rule merely serves to exclude secondary evidence—written or oral—about the *content* of an original document unless and until the absence of the original document is excused. (2 Jefferson, Cal. Evidence Benchbook, *supra,* Best Evidence Rule, § 31.1, pp. 1081-1085, and cases cited therein.) In effect this rule implements the principle "the document speaks for itself." If a litigant is seeking to introduce evidence of the words contained in a document, then he must introduce the document itself not some copy of the document or someone's verbal recollection of what words were in the document. But the best evidence rule has nothing to do with a situation where, as here, we are seeking to divine the intent with which the document was executed rather than what words are in the document. Then the writing does not speak for itself. Indeed we may need extrinsic evidence to determine what the words in the document were intended to convey. Accordingly, as respondents concede, the court clearly erred in excluding cross-examination about the parties' intent on grounds it ran afoul of the best evidence rule and I would so hold.

C. *The Exclusion of This Evidence Cannot Be Justified Under Evidence Code Section 352*

After conceding the court misapplied the best evidence rule, respondents attempted to save the rulings on the basis of Evidence Code section 352. Respondents contend the trial judge properly could have excluded the evidence based on his discretion under Evidence Code section 352. According to Evidence Code section 352, "[t]he court in its discretion may exclude

evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Although the court is accorded broad discretion to exclude evidence based on one of the above reasons, it does not have unlimited discretion. "The discretion granted the trial court by section 352 is not absolute [citations] and must be exercised reasonably in accord with the facts before the court. [Citations.]" (*Brainard* v. *Cotner* (1976) 59 Cal.App.3d 790, 796 [130 Cal.Rptr. 915]. Furthermore, "[w]hile it is within the sound discretion of the trial court to define the issues and direct the order of proof, the court may not act so as to preclude a party from adducing competent, material and relevant evidence which tends to prove or disprove any material issues." (*Estate of Horman* (1968) 265 Cal.App.2d 796, 809 [71 Cal.Rptr. 780].) "There are, of course, many factors which a trial court must consider when it is requested to exercise its discretion to deprive a party of probative evidence. Among these are: first, a determination that the evidence is relevant to an issue that is in dispute; second, a consideration of other proof on that issue available to the party which offers the evidence; and, third, that party's relatively greater need for the evidence if it must carry the burden of proof on the issue to which the evidence relates." (*Thor* v. *Boska* (1974) 38 Cal.App.3d 558, 568, fn. 8 [113 Cal.Rptr. 296].) The court elaborated on these factors in *Burke* v. *Almaden Vineyards, Inc.* (1978) 86 Cal.App.3d 768, 774 [150 Cal.Rptr. 419]: "Among factors which should be considered are its materiality; the strength of its relationship to the issue upon which it is offered; whether it goes to a main issue or merely to a collateral one; and, whether it is necessary to prove proponent's case or merely cumulative to other available and sufficient proof."

The trial judge failed to properly weigh the enumerated factors in his determination to exclude the evidence. He concluded the offered evidence on the issue of intent had little relevance based on his legal conclusion that the status of the parties was determinative on the issue of intent to novate. Since the status of the parties in a novation contest is not conclusive on the issue of intent, the trial judge should have given much greater weight to the relevance of other offered evidence. The evidence which appellant attempted to introduce was relevant because it was directed to the issue of intent, which is the controlling issue in a novation contest. Turning to other factors, the evidence was not cumulative, because the intent appellants sought to prove was not manifest on the face of the documents, nor was it necessarily to be found within the documents. Furthermore, appellants had no other evidence but the facts and circumstances surrounding the execution of the agreements, to show the intent to novate which would prove their case.

Thus, cross-examination was essential to elicit such evidence. Finally, as noted by the majority, appellants had a very heavy burden of proof due to their status as third parties to the transactions in question. Therefore, they had an unusually great need to present evidence that would prove their case.

Based on a fair balancing of all the above factors, it is clear the considerations for admitting the evidence far outweighed any factors which would justify its exclusion.

Respondents claim exclusion of the offered evidence resulted in harmless error, since the inference of intent not to novate was amply supported by the evidence. This conclusion is erroneous in light of the court's misinterpretation of the applicable rules of law. Had the court correctly applied the appropriate balancing tests, the offered evidence would have been admitted, and it may have been sufficient to support the opposing inference of intent to novate. Thus, the evidence, if admitted may have resulted in a decision for appellants. When evidence this central to the core issue of the case is excluded no court is really in a position to find its admission could not have changed the outcome. True, other evidence which was allowed in may be "sufficient" in one sense to support the trial court's judgment. But that does not mean this judge would have reached the same conclusion if he had admitted the contrary evidence offered by appellants on the issue of intent. Thus, in my view it is not possible to hold this error was harmless.

### III. Backup Contracts Should Be Interpreted as Operative When The Original Parties Indeed Create a Novation of Their Original Contract

As the majority correctly points out, contracts should be interpreted as operative whenever possible. The policy which supports interpreting contracts as operative whenever possible is equally applicable to third party backup contracts. Thus, the backup contract negotiated between the seller Lee and appellants Meadows should have been given full effect as binding upon the parties. The terms of the backup contract did not state it was effective only against other third parties desiring to obtain the property. Rather, its effectiveness was conditioned upon termination of the original contract. Considering the fact that novation was included as a means of termination, the back-up contract would appear, on its face, to be effective against original parties as well. Therefore, in order to give the backup contract full effect as a binding contract, a renegotiation or substitution of a new agreement between the original parties would require consent of the third party, or an additional renegotiation of the backup contract.

Although contracting parties have a right to modify the terms of their agreements, without effectuating a novation, *Travelers Ins. Co.* v. *Work-*

*men's Comp. App. Bd.* (1967) 68 Cal.2d 7, 17 [64 Cal.Rptr. 440, 434 P.2d 992], it does not follow that third parties with backup contracts should be squeezed out of the benefits of their contracts by original parties who want to change their minds one or more times. At least he should be given a fair opportunity to prove the original parties indeed did engage in novation. To rule as the majority does will, I fear, discourage people from agreeing to sign up as "back-up parties."

A petition for a rehearing was denied January 8, 1986, and appellants' petition for review by the Supreme Court was denied March 26, 1986. Bird, C. J., was of the opinion that the petition should be granted.