[Civ. No. 17025.   First Dist., Div. One.   Jan. 2, 1957.]

FLORENCE CROSAT, Respondent, v. ARTHUR L. PAIGE, Appellant.

Robert P. McNamee for Appellant.

Leonoudakis & Kleines for Respondent.

PETERS, P. J.—This action was brought by the plaintiff, an unmarried woman, to have defendant, also unmarried, declared to be the father of plaintiff's child, and for an order for the support of the child. After a trial before a jury, the trial judge granted the plaintiff's motion for a directed verdict. From a judgment based on the order for a directed verdict and from an order for support, costs and attorney's fees defendant appeals.

The case is a simple one. The child was admittedly conceived in June of 1952. Plaintiff testified that on the night of June 14th and early morning of June 15th of that year defendant had intercourse with her. Defendant, while admitting being in the company of plaintiff on the night in question, denied having intercourse with plaintiff on that night or any other time after April, 1952. In the face of this conflict in the evidence the trial court granted a directed verdict for the plaintiff. This was error. "A motion for a directed verdict may be granted upon the motion of the plaintiff, where, upon the whole evidence, the cause of action alleged in the complaint is supported, and no substantial support is given to the defense alleged by the defendant." (*Walters* v. *Bank of America*, 9 Cal.2d 46, 49 [69 P.2d 839, 110 A.L.R. 1259].) The trial court, on such a motion, has no power to weigh the evidence, or to pass upon conflicts in the evidence or upon the credibility of the witnesses. If there is a material conflict in the evidence the motion must be denied. (*Estate of Flood*, 217 Cal. 763 [21 P.2d 579]; *Estate of Lances*, 216 Cal. 397 [14 P.2d 768].)

Tested by these standards it is obvious that the trial

court was in error in granting the motion for the directed verdict.

Both principals admit first meeting in 1948 while they were both employed in San Francisco by the same company. They began dating early in 1951. Thereafter, defendant's job required him to do considerable traveling away from San Francisco, but they corresponded. Plaintiff testified that late in January or early in February, 1952, she visited defendant in Los Angeles and they had intercourse; that she again went to Los Angeles and saw defendant in April of 1952, and again they had intercourse. Plaintiff also testified that on June 14, 1952, she and defendant had dinner with friends in San Francisco, and then, in defendant's automobile, went to their favorite "necking" spot at Bernal Heights, where, between 1:00 a. m. to 6:30 a. m. of June 15th they engaged in the acts of intercourse.

Defendant admitted having intercourse with plaintiff in Los Angeles in April of 1952, but unequivocally and positively denied having intercourse with her at any time thereafter. These denials appear in at least 15 different places in the reporter's transcript.

Plaintiff admits that she had her regular menstrual period early in June, 1952, and that she first passed her period in July of 1952. The child was born March 18, 1953. The plaintiff designated defendant as the father of the child on the birth certificate.

Defendant admits that he took plaintiff to a dinner party on the night of June 14, 1952, and that thereafter he took plaintiff to Bernal Heights, and sat with her in the car until the morning of June 15th. His version of what there occurred is that plaintiff delivered an ultimatum, that is, that they get married or quit seeing each other. He testified that plaintiff told him that she had been seeing another man who had proposed marriage and that she wanted to know where she stood with defendant. Defendant told her that, because of his financial responsibilities, because of his mother's health, and because his job required him to travel so much, he could not and would not marry her. Defendant repeatedly denied having intercourse with plaintiff on this occasion.

Blood tests of all those involved demonstrated that defendant could have been the father of the child.

The mother of plaintiff testified that defendant called at her home about nine months after the baby was born and

referred to the baby as "my son" and offered to give him a good education. Defendant admitted this visit but denied the admission. Defendant testified that some time after the child was born he began paying plaintiff $50 a month. He stated that he did this as a matter of "expediency" to try and prevent a scandal on plaintiff's promise not to press the paternity action.

Plaintiff contends that in spite of defendant's positive denials of intercourse after April of 1952, defendant in fact admitted paternity in four letters written by him to her. The first of these letters is dated August 11, 1952, and the last March 29, 1954. We have read these letters carefully. We find in them no unambiguous and unequivocal admission of paternity, although, when read in connection with plaintiff's testimony, they would support a jury finding of paternity. It is unnecessary to quote all four letters. Typical is the letter of August 11, 1952, written shortly after plaintiff had informed defendant by letter that she had passed her July menstrual period. In this letter defendant stated: "I certainly hope your fears will not be realized, as we would *both* severely jeapordize [sic] our futures financially, and what is more important, socially if any scandal should arise. Naturally I'm just as worried as you, and for for [sic] the first time in many years, will say my prayers in hopes everything will work out for the best." Immediately preceding this passage is the following: "I hope by the time this reaches you everything will be back on schedule,—it seems highly unlikely that anything drastic will occur, at least on *my* account, if you will recall careful [sic] the details and circumstances of our last meeting. Perhaps if you will read up on some scientific explanation of the 'facts of life' you will understand what I mean. At any rate, there are *several* causes for the cessation which you mentioned, age, emotional disturbance, diet, etc. I certainly hope your fears will not be realized. . . ."

These passages are representative of the so-called admissions alleged to have been made in the letters. It is obvious that they do not constitute an unequivocal admission of paternity. They are subject to interpretation and explanation. Moreover, even if so interpreted they would conflict with the positive denials of defendant at the time of trial. Clearly, these were matters that should have been submitted to and determined by the jury.

Plaintiff makes much of the fact that defendant lied

in his deposition in which he stated that he had never had intercourse with plaintiff, and then at the trial testified as to the April, 1952, episode. The effect of this lying, was, of course, a matter that should have been submitted to the jury and not decided by the trial court on a motion for a directed verdict.

Another error committed by the trial court should be mentioned. Plaintiff was asked, when testifying as an adverse witness under section 2055 of the Code of Civil Procedure, whether she had had sexual relationships with other men during June and July of 1952. Plaintiff objected on the grounds that the question was ''purely irrelevant, immaterial.'' The objection was sustained. On appeal plaintiff seeks to sustain the ruling on the grounds that defendant made no offer of proof. The ruling was clearly erroneous. ■ Evidence of plaintiff's sexual relations with other men at or about the time of conception is admissible. (*Estate of Gird,* 157 Cal. 534 [108 P. 499; 137 Am.St.Rep. 131]; *Berry* v. *Chaplin,* 74 Cal.App.2d 652 [169 P.2d 442].) ■ It is equally clear that no offer of proof is necessary where the examination is of an adverse witness. (*Tossman* v. *Newman,* 37 Cal.2d 522 [233 P.2d 1]; *Lawless* v. *Calaway,* 24 Cal.2d 81 [147 P.2d 604].)

The order of support appealed from falls with the judgment.

The judgment and order appealed from are reversed.

Bray, J., and Wood (Fred B.), J., concurred.