Filed 7/30/13  Marriage of Serio CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re Marriage of LAURA SERIO and DONALD L. SERIO. | B242743 (Los Angeles County Super. Ct. No.  KD065590) |
| LAURA SERIO,<br><br>        Appellant,<br><br>        v.<br><br>DONALD L. SERIO,<br><br>        Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Rocky L. Crabb, Commissioner.  Reversed and remanded with directions.

Law Offices of Ronald B. Funk and Ronald B. Funk for Appellant.

Garrett C. Dailey for Respondent.

Appellant Laura Serio challenges a judgment of the family court modifying respondent Donald L. Serio's child support obligation. We conclude that the family court denied Laura an adequate opportunity to examine Donald regarding the large sums deposited in his bank account. We therefore reverse the judgment and remand the matter for a new trial.

## RELEVANT FACTS AND
## PROCEDURAL BACKGROUND

This is the second time that Donald's child support obligation has come before us. We summarize the events culminating in our first decision before describing the facts pertinent to the present appeal.

### A. *First Appeal*

Laura and Donald executed a pre-marital agreement regarding their rights to property and entitlement to spousal support in case of a separation or divorce. They married in July 2001, and a son, Patrick Blaze Serio, was born in February 2004. In September 2005, Laura filed a petition for dissolution of marriage. In 2007, the family court filed a judgment of dissolution with respect to status only, and later awarded the parties joint legal custody and equal physical custody of Patrick.

In December 2007, Laura asked the family court to establish Donald's permanent child support obligation. During the subsequent proceedings, she submitted evidence that her spousal support ended in April 2007, that she had little or no income, and that she was taking classes with the aim of entering college. Donald submitted evidence that he worked as an engineer for Serco Mold, Inc. (Serco), in which he also participated as a shareholder. Serco makes plastic parts for residential irrigation systems and other products. According to Donald, his

2

income derived from four sources, his salary, shareholder distributions, rental income, and interest income.

In late 2008, the family court conducted a trial on Donald's child support obligation. Following trial, the court found that Donald's gross average monthly income was $47,283. Applying the statutory guideline formula (Fam. Code, § 4055), the court determined that Donald's child support obligation was $3,396 per month.[1] The court also concluded that there was no basis for an "upward deviation" from the guideline formula, finding that Patrick resided with each parent for equal periods, and shared in their lifestyle, which the court characterized as not "opulent." On January 29, 2009, the court entered a final partial judgment regarding child support in accordance with its findings after trial. After Laura noticed an appeal from the judgment, we affirmed the court's rulings in an unpublished decision (*Serio v. Serio* (Feb. 24 2010, B215098)).

B. *Present Appeal*

1. *Request to Modify Child Support Obligation*

On April 29, 2011, Donald asked the family court to reduce his child support obligation, stating that his annual income from Serco had fallen from $650,000 to $300,000 due to a declining economy and the loss of customers. According to Donald's accompanying income and expense declaration, his average monthly income consisted of $4,400 in salary and "corporate perquisites," $22,916 in rental income, and $3,711 in interest income. The declaration also stated that his average

---

[1] All further statutory citations are to the Family Code, unless otherwise indicated.

3

monthly income included "minus" $2,498 in corporate distributions.[2]  His assets totaled $4,132,000 and his average monthly expenses were $4,000.

Laura opposed the request, stating that she was unemployed, attending school, and attempting to improve her "very limited English skills."  According to her income and expense declaration dated May 19, 2011, she had no income, assets totaling $30,000, and average monthly expenses of $5,958.  Laura maintained that she was dependent upon Donald's child support payments to care for Patrick.

On June 29, 2011, Donald submitted a second income and expense declaration regarding his child support obligations.  According to the declaration, his average monthly income consisted of $4,400 in salary and "corporate perquisites," $19,080 in rental income, $3,711 in interest income, and  "minus" $20,835 in corporate distributions.[3]  He also identified as additional income a $130,000 inheritance from his grandmother.  His assets totaled $6,132,000 and his average monthly expenses were $7,400.  In an accompanying declaration, he stated that his annual income from Serco had fallen to $200,000.[4]

In October 2011, Laura filed a motion to compel discovery, requested a continuance of the hearing on Donald's support obligation, and sought an award of attorney fees.  The motion contended that Donald had not produced certain financial documents relevant to his request to modify his support obligation.  In opposing the motion to compel, Donald maintained that he had produced his tax records and other information in his possession sufficient to determine the correct

---

[2]     The declaration describes Donald's average monthly corporate distribution as "$-2,498."

[3]     The declaration describes Donald's average monthly corporate distribution as "$-20,835."

[4]     On October 18, 2011, Laura filed a responsive declaration that reaffirmed her grounds for opposing the modification of Donald's support obligation.

guideline child support, but had properly objected to Laura's request that he produce Serco's financial records. In addition, Donald argued that the motion was untimely, lacked the required separate statement (Cal. Rules of Court, rule 3.1345(a)), and failed to show good cause for the requested discovery. The family court continued the hearing on Donald's support obligation to January 10, 2012, but deferred its ruling on Laura's motion to compel and attorney fee request.

In November 2011, Donald filed a memorandum of points and authorities in support of his request to present expert testimony from a vocational examiner regarding Laura's earning capacity (§ 4058). Donald asked the family court, in calculating the guideline child support, to use Laura's earning capacity, rather than her income. The motion stated: "[Donald] is specifically alleging that [Laura] has the present ability and opportunity to become fully employed. The use of a vocational evaluator wi[ll] provide the [c]ourt with the best evidence concerning the use of earning capacity."

On December 2, 2011, the family court denied Laura's pending motion to compel, but deferred ruling on her request for an attorney fee award. Later, on December 22, 2011, Laura filed a new motion to compel, together with motions for a continuance and an award of attorney fees. In support of the motions, she argued that Donald had not produced the documents she had requested during his deposition, which spanned three days from October through December 2011. Donald opposed the motions, maintaining that he had fully complied with Laura's requests for his documents, that he could not provide the records from Serco that she sought, and that Laura never asked Serco to produce those records, despite ample opportunity to do so. The family court denied the motion to compel and request for a continuance.

On January 9, 2012, Donald submitted a third income and expense declaration, stating that his average monthly income included $10,528 in salary,

5

$1,200 in "[p]erquisites," $11,544 in rental income, and $7,014.25 in interest. According to the declaration, his average monthly income required a reduction of $4,769 due to losses attributable to Serco. The declaration valued his assets at $1,770,000 and his average monthly expenses at $5,000.[5]

## 2. *Hearing*

On January 10, 2012, the family court initiated a three-day evidentiary hearing on Donald's child support obligation.

### a. *Donald's Evidence*

Donald's case-in-chief relied primarily on his own testimony. According to Donald, Serco's circumstances in 2011 were significantly worse than in 2008.[6] He attributed Serco's losses to the decline in the housing market, stating: "Principally, we manufacture products for the irrigation industry. We have one customer, Rain Bird, that represents approximately 70 percent of our sales and they're tied directly to housing. . . . [¶] . . . [¶] . . . As housing decreases, . . . Rain Bird sells less irrigation systems . . . and as there's less sales . . . , we sell less components . . . ."

According to Donald, the economic downturn resulted in significant cutbacks at Serco. He stated: "[W]e've laid off over half of our workforce in the last three years. We consolidated operations from multiple buildings in two states down to one building to go ahead and conserve operating costs. We went to week off, week on operations, actually physically closing down for a week at a time and

---

[5]     In January 2012, Laura filed an income and expense declaration that characterized her financial situation as materially unchanged from May 2011.

[6]     He testified that he owned 46.8 percent of Serco's stock. His mother was the remaining shareholder.

then restarting another week; reduction of pay to salaried employees, some up to as much as 50 per cent of their wage."

Regarding the changes in Serco's operations, Donald testified that in 2010, he and his mother bought Serco's facilities in La Verne, and transferred ownership of the facilities to an entity called "241 Partners" in which they held equal interests. Thereafter, 241 Partners rented the facilities to Serco for approximately $36,000 per month. According to Donald, the two businesses were "closely bound." For this reason, although Serco's losses totaled $57,000 in 2011, the two businesses, viewed together, remained slightly profitable. Donald received one-half of the net income from 241 Partners.

Later, in early 2011, Donald sold a facility in Arizona that had been rented to Serco. As a result of the sale, Donald's rental income from the property ended in February 2011, after which he began receiving interest from the loan related to the sale. Under the trust deed for the sale, Donald was entitled to monthly interest payments in varying amounts.

Noting the changes in Serco's operations, Donald testified regarding the four sources of his income, namely, his salary, shareholder distributions, rental income, and interest income. Regarding the first two components, Donald stated that in early 2011, Serco increased his monthly salary from $10,528 to $12,500 and also provided him with additional monthly perquisites worth $1,200, but made no shareholder distributions. Regarding the remaining sources of income, Donald stated that in 2011, he received average monthly interest payments totaling $7,014.50, comprising $3,144.25 from the Arizona property trust deed, and $3,870

from other loans that he had made to Serco.[7] Furthermore, in 2011, his average monthly rental income was $11,544, based on the rent from the Arizona property prior to its sale and his share of Serco's rental payments to 241 Partners.

As Donald no longer obtained rent from the Arizona property, he testified regarding 241 Partners as an ongoing and separate source of rental income. In 2011, his average monthly rental income through 241 Partners was $5,960, although the calculation of this figure incorporated an adjustment for depreciation expenses incurred in 2011. According to Donald, his current average monthly income through 241 Partners was approximately $4,000.[8]

Donald also testified that all of his income flowed through his bank account, including Serco's payments on his loans to it. Those payments included both interest and principal. He further stated that in early 2011, when he sold the Arizona property for approximately $1.15 million, he put the buyer's $150,000 down payment in his checking account.

David Laine, a vocational examiner, testified that he had interviewed Laura and contacted employers to assess her opportunities for employment. He opined that she was capable of earning from $8 to $11 per hour as a cashier, customer service representative, housekeeper, or warehouse worker. According to Laine, Laura's English skills were adequate for those positions. The family court

---

[7] According to Donald, Serco is "self-funded," that is, it does not rely on bank loans to obtain funds for capital purchases and other expenditures. Rather, he made loans to Serco, from which he derived interest as income.

[8] Donald also offered an explanation for the significant decrease in the value of his real and personal property, as stated in his June 2011 and January 2012 declarations: whereas the former valued that property at $6.1 million, the latter valued it at $1.6 million. Donald testified that the higher figure encompassed his ownership interests in Serco and 241 Partners, as well as his house and yacht, whereas the lower figure reflect only his house and yacht.

admitted Laine's report, which identified seven employers potentially interested in hiring Laura.

Laura testified as an adverse witness (Evid. Code, § 776). She denied that she had any sources of income not reflected in her income and expense declarations. She also stated that she had contacted the employers listed in Laine's report, but none had a position for her. Several employers did not return Laura's messages, and one told Laura that she was not qualified when she explained that she could not read or write English. Regarding her ability to read and speak English, Laura acknowledged that she had lived in California for 25 years, and had executed documents written in English when she bought a condominium. Laura also acknowledged having told Laine that she lacked the equivalent of a high school diploma, even though she had passed the G. E. D. test.

### b. *Laura's Evidence*

Cathy Fix, Laura's forensic accountant, testified that she had reviewed Donald's tax returns and personal bank records, but not Serco's tax records or financial documents. According to Fix, in 2010 and 2011, Donald made deposits in his personal bank account totaling $2,578,425. Of these deposits, Fix could not identify the sources of approximately $1,294,000 of the funds.

Fix also testified that because Serco is an S corporation, its profits and losses pass directly through to the individual shareholders and are reflected on their tax return. According to Fix, Donald's tax returns for 2006 through 2009 showed that during that four-year period he had paid taxes on approximately $2.8 million. She stated that because she lacked Serco's tax returns, she could not resolve the extent to which the funds reported on Donald's tax returns reflected distributions to shareholders or money retained by Serco as "working capital."

Based on the deposits in Donald's personal bank accounts and the income reported on his tax returns, Fix opined that his monthly "controllable cash flow" ranged from $35,000 to $44,000. Fix defined "controllable cash flow," as "the cash that a business owner or individual . . . has control over to pick and choose as to when they receive it, less any legitimate business expenses . . . ."

Donald asserted foundational objections to Fix's opinion, which the trial court overruled, remarking that it would ultimately decide whether her opinion had "appropriate foundation." The following colloquy then occurred:

"The Court: [Donald] has said . . . that all of his income goes into his bank account. But that doesn't justify the conclusion that all money that goes into the bank account is income, does it?

"[Fix]: No, and I absolutely agree with you on that. My problem is [that] I'm very limited in what was provided to me. So my presumption is that it is income. . . ."

"The Court: So then you are, as an expert, operating under a presumption that unless he shows you otherwise, you will conclude that every dollar that goes into his bank account must be income[,] is that correct?

"[Fix]: That is correct, absent any proof to the contrary.

"The Court: I'll indicate if that is the foundation for your opinion, your opinion is in deep trouble in this case."[9]

---

[9] Later, the family court again examined Fix regarding the foundations of her opinion. During Fix's cross-examination, in response to questions from Donald's counsel, Fix stated: "My understanding is that the burden of proof is on the person alleging that it is not income to identify . . . [that] it's . . . coming from another source that should not be considered by the court." The following exchange then occurred:

"The Court: . . . [Why] in the world did you conclude[], ma'am, that it is a burden of proof on one particular person to show money coming into the bank account is
*(Fn. continued on next page.)*

10

Following Fix's testimony, Laura presented Donald as an adverse witness (Evid. Code, § 776).[10]  Joseph Howington, Laura's counsel, began his examination by questioning Donald regarding the deposits into his bank account in September 2011, as reflected in his bank records.  Donald stated that some of the funds were his salary, and that others were loan payments from Serco, which included interest and principal.  When Donald's counsel objected that the bank records spoke for themselves, the family court asked, "[W]here are we going with this line of questioning?"  Howington replied that he was attempting to establish the sources of the deposits.  After observing that the questioning provided no basis for identifying precisely how much of the deposits constituted income, the following dialogue occurred:

"The Court:  Mr. Howington, can you show me what parts of the September deposits were income versus return of principal or anything other than income?

"Mr. Howington:  You're asking me?

---

something other than income?  What would give you any idea that you were entitled to jump to that conclusion?

"[Fix]:  Because I've been doing this sort of accounting since 1994.  And the presumption that we have always operated on is that if it's not income, please provide and identify any non-income deposits which are going in.

"The Court:  Who is 'we'?

"[Fix]:  Well, I was employed with Jen Wenner from 1994 through 2003. . . .  I subsequently took over the practice at the end of 2003, and we never varied that presumption.

"The Court:  Well, I'll indicate to you that this court does not presume that all entries into a bank account must be income.  The testimony of [Donald] . . . was that . . . he puts all his income into the bank account.  But he did not say that all of the deposits that go into the bank account are income.  You have concluded the second statement."

[10]   In addition, Laura also testified briefly on her own behalf, during which she denied that she could read English.

11

"The Court: Yes.

"Mr. Howington: I'm not the witness. I can't tell you.

"The Court: The objection is sustained. You're wasting my time." The presentation of evidence concluded with the court's ruling.


### 3. *Modification Order*

On January 23, 2012, the family court issued its tentative statement of decision. The court concluded that Donald had shown that since 2008, his average monthly income had decreased from over $47,000 to $25,738.[11] The court further concluded that Laura was properly imputed the capacity to earn $1,387 per month, that is, "full time employment at the level of at least [the] minimum wage," and that she was not entitled to an attorney fee award.

In the tentative statement of decision, the family court rejected Fix's testimony, stating: "[I]n reaching her opinion she considered that all money which [Donald] put into his account was current 'income.' She reached this conclusion without any foundation to do so, and notwithstanding the fact that [Donald] had testified . . . that while he does put his income into the bank account, he also puts his non-income money into the bank account. She could not determine what portion of the money deposited into his bank account was income and what portion was not income, and therefore simply concluded that it was all current income. The improper presumption of Ms. Fix and defective foundation for her opinion leads this Court to give her opinion no credibility or weight."

---

[11] The record does not disclose precisely how the family court arrived at its determination of Donald's average monthly income. During the closing arguments, Donald's counsel asserted that Donald's average monthly income was $25,738, without clearly relating that estimate to the evidence. Moreover, the statement of decision does not set forth the actual calculation underlying the finding.

12

The tentative statement of decision also disclosed the family court's intention to order a two-staged reduction in Donald's child support obligation: commencing February 1, 2012, Donald's obligation was to be modified to $2,001 per month, and commencing June 1, 2012, it was to be modified to $1,783 per month. The reductions reflected applications of the statutory guideline formula, in light of the court's findings regarding Donald's income and Laura's imputed income. The court stated: "In the first guideline calculation, no income is imputed to [Laura]. By the date of [June 1, 2012], a little over four months from now, [Laura] should have secured employment of at least [the] minimum wage, and that fact is added to the input data. Whether [Laura] secures that employment or not, those earnings are . . . imputed to her effective [June 1, 2012]." The court also stated its intention to order Donald to pay the reasonable costs of any necessary child care if Laura secured employment.

On May 16, 2012, the family court issued its final order, which adopted the the findings and orders contained in the tentative statement of decision. This appeal followed.

**DISCUSSION**

Laura challenges the family court's rulings regarding Donald's child support obligations. She argues that the court erred in (1) determining that Donald showed a material change in his circumstances, (2) imputing income to her, and (3) denying her request for an attorney fee award. For the reasons discussed below, we conclude that the family court committed reversible error by curtailing the examination of Donald regarding the source of the deposits into his bank account.

13

A. *Governing Principles*

Section 4055 states the guideline formula, which determines the amount of a party's child support obligation on the basis of several factors, including the "high earner's net monthly disposable income."[12] Under the applicable statutes, "[t]he amount of child support established by the [guideline] formula . . . is presumed to be . . . correct." (§ 4057, subd. (a).)

On appeal, Laura does not challenge the application of the guideline formula, but instead attacks the family court's determinations regarding the parties' net income. For that reason, our focus is on the variables in the guideline formula designated as "HN" and "TN," which refer to the "high earner's net monthly disposable income," and the "total net monthly disposable income of both parties." (§ 4055, subds. (b)(1)(C), (b)(1)(E).) Section 4060 provides: "The monthly net disposable income shall be computed by dividing the annual net disposable income by 12. If the monthly net disposable income figure does not accurately reflect the actual or prospective earnings of the parties at the time the determination of support is made, the court may adjust the amount appropriately." Under section 4059, each parent's net annual disposable income is derived from his or her gross

---

[12] The guideline formula is as follows: "CS = K [HN - (H%) (TN)]." (§ 4055, subd. (a).) The variables here are defined as follows:

"(A) CS = child support amount.

"(B) K = amount of both parents' income to be allocated for child support . . . .

"(C) HN = high earner's net monthly disposable income.

"(D) H% = approximate percentage of time that the high earner has or will have primary physical responsibility for the children compared to the other parent. . . .

"(E) TN = total net monthly disposable income of both parties." (§ 4055, subd. (b)(1).)

14

annual disposable income, subject to enumerated adjustments.  In turn, "section 4058 defines 'gross income' with language that was 'lifted straight from the definition of income in section 61 of the Internal Revenue Code.'"  (*In re Marriage of Loh* (2001) 93 Cal.App.4th 325, 332, quoting *In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 529.)

A child support order may be modified when there is a material change of circumstances.  (*In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1048.)  "'[T]he [family] court's determination to grant or deny a modification of a support order will ordinarily be upheld on appeal unless an abuse of discretion is demonstrated.'  [Citation.]  Reversal will be ordered only if prejudicial error is found after examining the record of the proceedings below.  [Citation.]"  (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 34 (*Calcaterra*).)


B.  *Limitation on Donald's Testimony as Adverse Witness*

Laura challenges the family court's finding regarding Donald's average monthly income, asserting several contentions framed in terms of the burden of proof at the evidentiary hearing.  She contends the court misallocated the burden of proof regarding Donald's income throughout the hearing, including Howington's examination of Donald as an adverse witness during the presentation of Laura's defense case.  Although we reject some of Laura's contentions (see pt. C., *post*), we agree that the court committed reversible error by limiting Howington's examination of Donald.

The record discloses that when Donald's counsel objected to Howington's examination on the ground that the bank records spoke for themselves, the family court asked, "[W]here are we going with this line of questioning?"  Howington replied that he intended to inquire regarding the sources of the deposits.  After Howington acknowledged that *he* could not show, with respect to each bank

15

deposit, the extent of which the funds reflected income, rather than principal or other non-income, the family court sustained the pending objection.

We conclude that the family court erred. To begin, we observe that because Donald testified as an adverse witness, Howington's inquiry was functionally equivalent to cross-examination. (*Crosat v. Paige* (1957) 147 Cal.App.2d 385, 389.) Under those circumstances, Laura may properly assert on appeal that the ruling constituted reversible error, even though Howington made no offer of proof regarding the specific testimony that he expected to elicit from Donald. (*Tossman v. Newman* (1951) 37 Cal.2d 522, 525-526.) That is because "[q]uestions on cross-examination . . . are largely exploratory, and [thus] it is unreasonable to require an offer of proof since counsel often cannot know what pertinent facts may be elicited." (*Id.* at p. 525.)

Here, the family court's ruling cannot be affirmed on the grounds specified in the objection raised by Donald's counsel or stated by the family court. The objection that a document speaks for itself implements the secondary evidence rule (formerly called the "best evidence" rule), which ordinarily obliges a party to introduce a written document into evidence, rather than offering a witness's recollection of the words in the document. (*Meadows v. Lee* (1985) 175 Cal.App.3d 475, 490; see 2 Witkin, Cal. Evidence (4th ed. 2000) Documentary Evidence, § 28, pp. 152-153.) However, because Howington's intent was to identify the sources of the deposits reported in Donald's bank records, the objection was inapplicable. (*Meadows v. Lee, supra,* at p. 490.)

Nor can the ruling be affirmed on the basis stated by the family court, namely, that the proposed questioning was a "wast[e of its] time." Generally, on cross-examination, a party has a due process right to seek "relevant evidence of significant probative value to the issue before the court." (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 817.) In child support proceedings involving a wealthy

16

parent, it is ordinarily relevant whether the parent may have rearranged or concealed assets or income in an effort to minimize his or her support obligations. (*In re Marriage of Berger* (2009) 170 Cal.App.4th 1070, 1082-1083; *In re Marriage of Chakko* (2004) 115 Cal.App.4th 104, 109 (*Chakko*); *In re Marriage of Schulze, supra,* 60 Cal.App.4th at p. 529.)

That issue was critical here. During Donald's case-in-chief, he offered evidence that his average monthly income had decreased some 45 percent to $25,738, thereby claiming that his yearly income was approximately $309,000. In addition, Donald stated that he owned assets valued at $6.1 million. In presenting his case-in-chief, Donald identified the source of only a few deposits in his bank account. However, Fix later testified that in 2010 and 2011, Donald made deposits in his personal bank account totaling $2,578,425, of which $1,294,000 came from unknown sources. In view of the wide disparity between Donald's claimed income and the large flow of funds from undisclosed sources through his bank account, Howington's proposed inquiry was directed at an issue central to the proceedings. The court thus erred in sustaining the objection. (*Crosat v. Paige*, *supra*, 147 Cal.App.2d at p. 389.)

We recognize that the family court, in sustaining the objection, focused on a distinct issue, namely, whether Howington could show the precise extent to which each deposit reflected income, as opposed to principal or other forms of non-income. The court's attention appears to have been drawn initially to that issue during Fix's testimony, who stated that her opinion relied on the "presumption" that each deposit into Donald's account constituted income unless Donald proved otherwise. However, Howington's proposed examination targeted a different and independently important issue, that is, the sources of the funds entering Donald's account. In our view, Howington was entitled to determine whether Donald could

17

provide a credible account of the sources of those funds that was consistent with his claimed income.

We further conclude that the error was prejudicial. Ordinarily, an error or defect at trial is not harmless when "there is a 'reasonabl[e] probab[ility]' that it affected the verdict." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.) In this context, "a 'probability' . . . does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility. [Citations.]" (*Id.* at p. 715, italics omitted.) Here, Donald presented little documentary evidence to corroborate his testimony regarding his income and assets. He offered no tax records or other evidence from Serco, even though his testimony was predicated on Serco's purported financial circumstances. In view of the disparity between Donald's claimed income and the unexplained funds in his bank account, the inquiry into the sources of the funds in Donald's bank account was crucial to an assessment of his credibility. Accordingly, the judgment must be reversed for a new trial.

### C. *Laura's Other Contentions*

For the guidance of trial court upon remand, we address Laura's remaining contentions, insofar as they concern issues relevant to a new trial.

#### 1. *Pre-Trial Motions*

Laura contends the family erred in ruling on her pre-trial motions. Pointing to *Chakko*, *supra*, 115 Cal.App.4th 104, Laura argues that the court was obliged to bar Donald from presenting evidence during the hearing because he failed to produce Serco's financial records during discovery. We reject this contention.

Generally, when a party fails to respond to discovery requests, Code of Civil Procedure section 2023 "'permits (1) a monetary sanction, (2) an issue sanction,

(3) an evidence sanction, (4) a terminating sanction or (5) a contempt sanction . . . [¶] . . . [¶] In choosing among its various options for imposing a discovery sanction, a trial court exercises discretion . . . .  [Citation.]'" (*Lang v. Hochman* (2000) 77 Cal.App.4th 1225, 1244, quoting *Kuhns v. State of California* (1992) 8 Cal.App.4th 982, 988.)

We see no abuse of discretion in the family court's decision not to impose issues or terminating sanctions.  Generally, the duty to produce documents is limited to items "in the possession, custody, or control of any other *party to the action*." (Code Civ. Proc., § 2031.010, subd. (a), italics added; *People ex rel. Lockyer v. Superior Court* (2004) 122 Cal.App.4th 1060, 1080.)  Furthermore, Donald disobeyed no order to produce the documents that Laura sought, as the family court denied her motions to compel.  Because she does not challenge these rulings on appeal, she has forfeited any contention that the court erred in ruling on the motions to compel.  We also note that Laura made no attempt to obtain the records from Serco, even though the discovery statutes permit discovery of records held by nonparties to an action (*Monarch Healthcare v. Superior Court* (2000) 78 Cal.App.4th 1282, 1287; Code Civ. Proc. § 2020.010, subd. (a)(3)).

Laura's reliance on *Chakko* is thus misplaced.  There, in a child support proceeding, a father who owned a corporation refused to produce his tax returns during discovery. (*Chakko, supra,* 115 Cal.App.4th at pp. 106-107.)  After the father disobeyed a court order to provide the tax returns, the family court awarded issue sanctions against him that precluded him from presenting specified evidence regarding his child support obligation.  (*Ibid*.)  The appellate court affirmed the issues sanction and the related child support order.  (*Id*. at pp. 108-110.)  In contrast, Donald disobeyed no order to compel and produced all his own records, including his most recent tax returns.  Accordingly, the family court did not err in rejecting Laura's request for issues or terminating sanctions.

19

### 2. *Laura's Imputed Income*

Laura contends the family court improperly imputed to her the capacity to earn $1,387 per month, which reflected "full time employment at the level of at least [the] minimum wage." Generally, the statutory scheme governing the guideline formula obliges each parent to "pay for the support of the children according to his or her ability." (§ 4053, subd. (d).) Moreover, the family court may impute income to a parent based on his or her income, provided that the imputation is "consistent with the best interests of the children." (§ 4058, subd. (b).) Laura argues that there was insufficient evidence to support the family court's imputation of income.[13]

Laura challenges the sufficiency of the evidence on the ground that the vocational examiner failed to conduct vocational testing when he interviewed her. However, the evidence admitted at trial fully supports the court's determination. David Laine, the vocational examiner, testified that Laura's English skills were adequate for her to earn the minimum hourly wage as a cashier, customer service representative, housekeeper, or warehouse worker. In response, Laura testified that she could not read English. The family court found that this testimony was not credible, noting that Laura's school records manifested her ability to read English, as did her responses at trial to questions regarding her income and expense declarations. Accordingly, there is sufficient evidence to support the imputation of income to Laura.

---

[13] "'On review for substantial evidence, we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference. [Citation.] We accept all evidence favorable to the prevailing party as true and discard contrary evidence. [Citation.]' [Citation.]" (*Calcaterra*, *supra*, 132 Cal.App.4th at p. 34.)

*In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, upon which Laura relies, is distinguishable.  There, the family court imputed average monthly income of $13,333 to a mother who had 95 per cent custody of the pertinent child, even though the evidence showed that her actual monthly income was approximately $250.  (*Id*. at p. 16 & fn. 5.)  In reversing, the appellate court held that for purposes of the guideline formula, income may not imputed to a custodial parent absent a finding that the imputation is in the best interests of the pertinent children.  (*Id*. at p. 13.)  The court explained:  "[I]t is counterintuitive -- often counterproductive -- to impute income to a custodial parent, because the objective effect of such an imputation will be to reduce the money otherwise available for the support of any minor children."  (*Id*. at p. 19.)

In contrast, Laura is not the primary custodial parent, as the judgment of dissolution provides that Donald and Laura have equal physical custody of Patrick; moreover, the family court imputed only minimum wages to Laura, and required Donald to pay for child care while Laura works.  As Patrick is now nine years old and is of school age, there is sufficient evidence to support the family court's implied finding that it was in Patrick's best interests for Laura to enhance her sources of income through employment.  (See *In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1339 [family court properly imputed income to custodial parent who elected to seek additional educational qualifications in lieu of finding employment for which she was qualified].)  In sum, we see no error in the imputation of income to Laura.

### 3. *Denial of Fee Award*

Laura maintains that the family court erred in denying her request for a fee award under section 2030.  Her sole contention is that the court did not properly assess Donald's income during the evidentiary hearing.  However, the record

discloses that the family court denied Laura's fee request because she submitted insufficient evidence to support the award.  As explained in *In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 869, a fee award is improper absent a determination that the fees incurred are "'reasonably necessary.'"  Here, the court noted that Laura submitted no evidence regarding her attorney fees at the evidentiary hearing, and that her income and expense declaration dated January 5, 2012, failed to state why the claimed fees "were reasonably incurred."  The court thus did not abuse its discretion in denying Laura's fee request.

## DISPOSITION

The judgment is reversed with respect to the determination of Donald's child support obligation, and the matter is remanded to the trial court for a new trial in accordance with this opinion.  Laura is awarded her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.

We concur:


EPSTEIN, P. J.


SUZUKAWA, J.